## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| ANNETTE M. POWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12 CV 1996 DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Annette M. Powell for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 7.)  For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Annette M. Powell, born on May 14, 1964, filed her application for Title XVI benefits on December 28, 2009.  (Tr. 158-66.)  She alleged an onset date of October 9, 2009, due to cardiomyopathy, fatigue, fibromyalgia, and hypertension.  (Tr. 184.)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

Plaintiff's application was denied initially on February 17, 2010, and she requested a hearing before an ALJ. (Tr. 66-78.)

On April 15, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 14-23.) On August 28, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the commissioner.

## II. MEDICAL HISTORY

On August 7, 1997, plaintiff was found disabled as of January 18, 1997 based on her diagnoses of dilated cardiomyopathy.[2] The decision noted that an echocardiogram performed in January 1997 revealed moderate dilation of the left ventricle, moderate to severe left ventricular dysfunction, marked hypokinesis[3] of the anteroseptal wall, mild to moderate hypokinesis of the remaining walls, and an ejection fraction of 36%.[4] The decision further noted that in July 1997 plaintiff's physician stated that her condition resulted in a Class 3 or Class 4 impairment based on the New York Heart Association's heart disease classification list[5] and that she experienced shortness of breath and chest discomfort following minimal exertion. (Tr. 33, 58-64.)

---

[2] Cardiomyopathy, or heart muscle disease, is a type of progressive heart disease in which the heart is abnormally enlarged, thickened, or rigid. WebMD, http://www.webmd.com/hear-disease/guide/muscle-cardiomyopathy. As a result, the heart's muscle's ability to pump blood is weakened often causing heart failure and the backup of blood into the lungs or rest of the body. Id.

[3] Hypokinesis is diminished or slow movement. Stedman's Medical Dictionary 861 (28th ed. 2006).

[4] The ejection fraction is "the fraction of the blood contained in the ventricle at the end of diastole that is expelled during its contraction, i.e., the stroke volume divided by end-dialostic volume, normally .55 (by electrocardiogram) or greater; with the onset of congestive heart failure, the ejection fraction decreases, sometimes to .10 or even less in severe cases." Stedman at 769.

[5] A Class 3 classification is a moderate impairment and results in marked limitation of physical activity. Heart Failure Society of America, http://www.abouthf.org/questions_stages.htm. A Class 4 classification is a severe

After qualifying for disability, plaintiff continued to receive treatment for cardiomyopathy, depression, and anxiety. On September 4, 1997, plaintiff visited her treating physician, James Hayden, M.D., complaining of ankle pain, gland pain in her neck that radiated down her left arm, tight chest, fatigue, dizziness, nausea, and vomiting. Dr. Hayden noted that plaintiff had suffered a recent infection in her left knee, which caused fatigue. He also stated that the joint pain required more rest but that her chest was clear and her heart was regular. He advised plaintiff to contact him at the end of her antibiotic cycle and instructed her to return the following month. (Tr. 380.)

On September 30, 1997, plaintiff returned to Dr. Hayden for her follow-up appointment and complained of heart palpitations. Dr. Hayden noted that her chest sounded clear, her heart was regular, and she had no significant symptoms of leg edema. Additionally, he cautioned her against using anti-inflammatory medications as they may have interfered with the Capoten prescription, causing increased shortness of breath and palpitations.[6] (Tr. 381.)

On October 29, 1997, plaintiff visited Dr. Hayden, complaining of numbness in her right face, scalp, and hands occurring at night. She worried that the numbness would spread to her heart. Dr. Hayden noted that during the prior year she had numbness in her feet and that her father died of a brain aneurysm with similar symptomology. Dr. Hayden gave plaintiff splints to wear at night. He assessed dilated cardiomyopathy, paresthesia of the right face and scalp, and bilateral carpel tunnel syndrome. He also stated the need for an echocardiogram and the need for a CT for the numbness. (Tr. 382.)

On November 4, 1997 plaintiff underwent an echocardiogram at Raytown Cardiac Ultrasound. H. Allen Strunk, Jr. D.O., F.A.C.C., determined that plaintiff's left ventricular function and ejection fractions improved in comparison to the echocardiogram performed on June 25, 1997. Plaintiff underwent a CT scan on her head. Brett Acker,

---

impairment and results in the inability to carry out any physical activity without discomfort. Id.

[6] Capoten is used to treat high blood pressure and is also used to treat heart failure. WebMD, http://www.webmd.com/drugs.

M.D. determined that plaintiff's cerebral cortex and ventricular system were normal and found no aneurysm. Plaintiff also received a Carotid Doppler examination, which revealed no aneurysm or significant plaque. (Tr. 385-87.)

On November 15, 1997, plaintiff had chest X-rays performed for cough and possible pneumonia and to compare to her previous X-ray performed on January 6, 1997. Scott S. Grugan, M.D., determined that plaintiff had calcified left hilar lymph nodes but no other abnormalities in the heart or lungs. Dr. Grugan further noted that there had not been any significant improvements in plaintiff's chest as compared to the images taken in January. (Tr. 388.)

On November 17, 1997, plaintiff returned to Dr. Hayden for a follow-up appointment. Dr. Hayden noted that plaintiff was treated in the emergency room the previous weekend for a migraine and noted the headaches' association with muscle contractions and phonophobia. Additionally he noted that she was experiencing extreme fatigue despite the improvements seen on her echocardiogram and CT. He prescribed her Zoloft, continued her on Xanax, and requested that she return in four to six weeks. (Tr. 383.)

On December 23, 1997, Dr. Hayden saw plaintiff for a follow-up visit, and he noted continued improvement despite persistent problems with anxiety. He continued the treatment regiment and increased her Zoloft dosage. (Id.)

On February 9, 1998, plaintiff reported to Dr. Hayden complaining of problems getting up in the morning with bad dreams and premonition, shortness of breath, leg swelling, and facial swelling. Dr. Hayden noted that plaintiff's cardiomyopathy was stable and increased her Zoloft dosage for fibromyalgia. (Tr. 391.)

On March 10, 1998, plaintiff underwent an EEG test after complaining of increased panic disorder, headaches, and loss of consciousness. In his report Thomas Pearson, M.D., noted that plaintiff had a complicated medical history and that her

prescription medication consisted of Lanoxin, Xanax, Zoloft, and Lasix.[7] He determined that plaintiff's EEG was normal. (Tr. 398.)

On March 23, 1998, plaintiff reported to Dr. Hayden for a follow-up appointment. He noted that after discontinuing Zoloft in favor of Paxil, plaintiff had a marked improvement in her symptoms as her headaches and panic attacks had abated, and her muscle aches had decreased. Dr. Hayden assessed cardiomyopathy and associated anxiety and depression. He stated that he would be continuing plaintiff on Paxil and requested a follow-up in a month. (Tr. 392.)

On April 24, 1998, plaintiff was seen by Dr. Hayden and complained of chest pain and pain in her right leg as well as aching from her waist to knees. He increased her Paxil dosage and planned to wean her from Xanax and Lasix. He also assessed cardiomyopathy, congestive failure, and depression. (Id.)

On June 28, 1998, plaintiff reported to Dr. Hayden complaining of weight gain, lower abdominal pain, and constipation. He noted that her most recent echocardiogram, performed on May 19, 1998, demonstrated an ejection fraction of 52% and released her for full activity. Dr. Hayden further noted that after trying to stop taking Lasix, plaintiff developed recurrent fluid retention. Additionally, he stated she continued to exhibit intermittent symptoms of anxiety. He prescribed Lasix and stool softeners and ordered a gastrointestinal evaluation. (Tr. 400.)

On September 25, 1998, plaintiff visited Dr. Hayden for a follow-up appointment, and he stated that she was doing great. He assessed cardiomyopathy, congestive heart failure, and anxiety. He noted that her cardiomyopathy was improving and possibly resolving, that he would continue to attempt to wean her from Lasix. and that her Xanax was discontinued but she would continue taking Paxil. He also noted that the congestive heart failure appeared to be resolved. (Id.)

---

[7] Lanoxin helps make the heart beat stronger and with a more regular rhythm. Drugs.com, http://www.drugs.com/lanoxin.html. Lanoxin is used to treat heart failure. Id. Lasix treats fluid retention (edema) in people with congestive heart failure. Drugs.com, http://www.drugs.com/lasix.html.

On January 27, 1999, Dr. Hayden cleared plaintiff for full activity. He noted that her cardiomyopathy had completely resolved and that her depression was well-controlled. Additionally, he stated he wanted her to stay on Paxil for another six to twelve months. (Tr. 401.)

On June 30, 1999, plaintiff visited Dr. Hayden complaining of backache, headache, nausea, joint pain, and distorted dreams. Dr. Hayden noted no evidence of cardiomyopathy and prescribed Paxil. (Tr. 404.)

On August 23, 1999, plaintiff saw Dr. Hayden for a follow-up appointment. He noted that she recently dealt with the death of her father-in-law but was doing well. He stated that she had exhausted her Paxil prescription and would not be continuing it and that she wanted to wean herself from Capoten. He decreased her Capoten dosage. (Tr. 405.)

On November 23, 1999, plaintiff had an appointment with Dr. Hayden and was doing well but suffered from minor fatigue. He noted that the resolution of her depression and ordered an echocardiogram to assess her cardiomyopathy. (Id.)

On December 6, 1999, plaintiff underwent an echocardiogram by Dr. Strunk. He determined that there was a redundant mitral valve and mild diffuse left ventricular hypokenisis. Dr. Strunk found plaintiff's systolic ejection fraction mildly reduced to between 45% and 50%. (Tr. 408-09.)

On December 18, 2000, plaintiff was treated by Physician Assistant Mindy A. Kistler. Ms. Kistler noted that plaintiff appeared short of breath and suffered from increased fatigue and lower extremity aching. Although plaintiff's heart rate and rhythm were regular, Ms. Kistler ordered another echocardiogram due to the history of cardiomyopathy and the low ejection fraction on the previous year's tests. (Tr. 411.)

On February, 7, 2001, plaintiff reported to Dr. Hayden to follow-up on her echocardiogram, received on January 5, 2001. Dr. Hayden noted a decrease in her ejection fraction and recommended an increase in her Capoten dosage. (Tr. 417-18.)

On April 6, 2001, plaintiff visited Dr. Hayden for a follow-up appointment complaining of vegetative symptomology, including sleep disturbance, appetite

disturbance, mood swings, irritability, loss of pleasure, and easy bruising. He noted that her heart was regular. Dr. Hayden suspected coagulopathy and vasculitis. He increased her Prinivil dosage.[8] (Tr. 419.)

On September 7, 2001, plaintiff saw Dr. Hayden. She complained of increased fatigue, shortness of breath, and a weight gain of seven pounds. He noted that her chest was clear and that she showed no sign of edema. He also ordered an echocardiogram. (Tr. 427.)

On October 5, 2001, plaintiff was seen by Dr. Hayden to discuss the results of the echocardiogram underwent on September 21, 2001. Dr. Hayden noted that the echocardiogram looked great and that there had been no change from the previous test. Plaintiff complained that her feet were starting to burn and informed Dr. Hayden that this occurred annually. He recommended that she continue treatment for cardiomyopathy and depression. (Tr. 430-31.)

On January 25, 2002, plaintiff visited Dr. Hayden, complaining of hypersomnia,[9] fatigue, mood swings, loss of libido, and shortness of breath. Dr. Hayden noted improvement with her blood pressure and that weight gain likely caused her shortness of breath. He found no changes regarding cardiomyopathy and opined that she needed to stay indefinitely on Prinivil. For depression, he switched her Paxil with Celexa.[10] (Doc. 431.)

On February 22, 2002, plaintiff reported to Dr. Hayden to monitor her switch from Paxil to Celexa. He noted increased forgetfulness but no other adverse side effects. He

---

[8] Prinivil is used to treat high blood pressure (hypertension), congestive heart failure, and to improve survival after a heart attack. Drugs.com, http://www.drugs.com/prinivil.html.

[9] Hypersomnia, or excessive sleepiness, is a condition which a person has trouble staying awake during the day. WebMD, http://www.webmd.com/sleep-disorders/guide/hypersomnia (last viewed July, 11, 2013).

[10] Celexa is used to treat depression. WebMD, http//:www.webmd.com/drugs.

recommended that she increase her activity to help her mood and energy. He further noted that her depression had improved and her cardiomyopathy was stable. (Tr. 432.)

On May 23, 2002, plaintiff visited Dr. Hayden. complaining of sharp chest pain and hypersomnia. He stated that that her cardiomyopathy was doing well and increased her Celexa dosage to address fatigue and depression. (Id.)

On August 29, 2002, plaintiff reported to Dr. Hayden complaining of hypersomnia caused by the humidity and knee swelling caused by sitting. She also mentioned to Dr. Hayden some generalized areas of pain but did not mention chest pain or shortness of breath. Dr. Hayden noted plaintiff's medication regimen consisted of Prinivil, Lorpressor, aspirin, and Celexa.[11] He continued her regimen for both depression and cardiomyopathy. (Tr. 435.)

On November 7, 2002 plaintiff visited Dr. Hayden to discuss the results of the echocardiogram she underwent on October 5, 2002. Dr. Hayden noted that plaintiff's ejection fraction had improved to the 50%-55% range. Plaintiff complained of increased vegetative symptomology despite the Celexa, including sleep disturbance, appetite disturbance, mood swing, anhedonia, and difficulty in concentration. [12] She additionally complained of joint and muscle pain as well as constipation. Dr. Hadyen noted no change in her cardiomyopathy, decreased her Celexa dosage, and prescribed Effexor.[13] (Tr. 436-38.)

On December 5, 2002, February 13, 2003, and May 22, 2003, plaintiff saw Dr. Hayden for follow-up appointments. In each instance, Dr. Hayden noted plaintiff was doing well and that her cardiomyopathy was stable. (Tr. 439.)

---

[11] Lorpressor is used to treat high blood pressure. WebMd, http://www.webmd.com/drugs.

[12] Anhedonia is a psychological condition characterized by inability to experience pleasure in normally pleasurable acts. Merriam-Webster, www.merriam-webster.com/dictionary/anhedonia.

[13] Effexor is used to treat major depressive disorder, anxiety, and panic disorder. Drugs.com, http://www.drugs.com/effexor.

On September 25, 2003, plaintiff reported to Dr. Hayden complaining of shortness of breath, chest pain, and frequent urination. He noted the need for another echocardiogram but stated that her chest was clear and her heart was regular. (Tr. 440.)

On December 18, 2003, plaintiff visited Dr. Hayden to discuss the echocardiogram she underwent on October 9, 2003. Dr. Hayden noted that her ejection fraction was stable and that she was doing well. He also continued her heart prescriptions. (Tr. 440, 441-42.)

On March 25, 2004, plaintiff saw Dr. Hayden. She remained on the same medication regimen and was doing fairly well. Dr. Hayden noted that plaintiff's intent to move to Missouri and refilled her prescriptions to address his concern about plaintiff acutely stopping her medications. (Tr. 444.)

On March 14, 2005, plaintiff saw Julius F. Punzalan, M.D, complaining of oversleeping. Dr. Punzalan noted plaintiff's history of cardiomyopathy. (Tr. 242.)

On June 14, 2005, Dr. Punzalan found plaintiff's cardiomyopathy asymptomatic. (Tr. 241.)

On March 13, 2006, Dr. Punzalan noted improvement of plaintiff's cardiomyopathy based on a recent echocardiogram. (Tr. 239.)

In February 2007, plaintiff's disability benefits were discontinued due to an increase in household income. (Tr. 180, 243.)

On March 20, 2007, plaintiff complained of dizziness, and generalized weakness. Dr. Punzalan lowered her metoprolol dosage. [14] On May 8, 2007, plaintiff indicated that she no longer experienced dizziness. (Tr. 235-36.)

On August 15, 2008, Dr. Punzalan opined that plaintiff's cardiomyopathy was doing well. (Tr. 229.)

On April 15, 2009, Thomas J. Spencer, Psy.D., performed a psychological evaluation for a determination of Medicaid eligibility. Plaintiff told Dr. Spencer that she

---

[14] Metoprolol tartate is used for treating high blood pressure and long term treatment of chest pain. Drugs.com, http://www.drugs.com/cdi/metoprolol-tartrate.html.

continued to suffer from edema, heart problems, panic attacks, chronic worrying, and depression. She compared her panic attacks to heart attacks and stated, "I feel like I'm dying." She also stated that she suffers panic attacks in cars when both a driver and passenger. Dr. Spencer noted plaintiff's anxiety, restlessness, mildly pressured speech, and circumstantial flow of thought. Plaintiff further stated that she was irritable due to her lack of medication and suffered mood swings that triggered crying episodes. Plaintiff described her current work as a janitor at Dent County Animal Shelter where she had been employed for eight months, averaging about twelve to sixteen hours and four days per week. She told Dr. Spencer that after work she would lie down and that she also performed housework, cooked, and watched television. (Tr. 243-44.)

Dr. Spencer diagnosed recurrent moderate major depressive disorder and generalized anxiety disorder and assigned her a GAF score of 50-55.[15] Dr. Spencer opined that plaintiff suffered from a mental illness that interfered with her ability to engage in full-time employment suitable for her age, training, experience, and education. He determined that her disability could extend for longer than a year but noted that with proper treatment and compliance, it was likely her condition would improve. (Tr. 246.)

On May 26, 2009, plaintiff visited Bradley Jones, D.O., requesting prescriptions and had been without medication since the previous July. He assessed cardiomyopathy, congestive heart failure, acute renal failure, and depression. Dr. Bradley prescribed her

---

[15] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job.)

A score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

Prinivil, Effexor, Lopressor, Lasix, and potassium chloride. He also emphasized the importance of maintaining her medication regimen. (Tr. 247-51.)

On September 2, 2009, plaintiff was seen by Dr. Jones for a refill on her medications. Dr. Jones noted that plaintiff's pulmonary and cardiovascular checks were normal. He prescribed plaintiff Lisinopril, metoprolol tartate, Atorvastatin, and furosemide for her cardiomyopathy and Effexor for depression.[16] (Tr. 271.)

On September 10, 2009, John Hess, M.D., performed an echocardiogram on plaintiff. In his report, Dr. Hess described plaintiff's family medical history, including her mother's cardiomyopathy and her brothers' hypertension. He also included that plaintiff lived with her husband, abstained from drug or alcohol use, and worked at an animal shelter. Dr. Hess observed that her most recent echocardiogram revealed an ejection fraction of thirty percent and that she suffered from shortness of breath and edema in her lower extremities. Additionally, he increased plaintiff's Lasix dosage and prescribed Coreg in place of metoprolol.[17] Finally, he expressed concern that plaintiff lacked insurance and likely would need an implantable defibrillator in the near future. (Tr. 290-91.)

On October 5, 2009, plaintiff visited Dr. Jones, complaining of occasional chest pain, constant arm numbness, balancing problems, and increased anxiety. Dr. Jones refilled plaintiff's prescriptions. (Tr. 276-82.)

On October 22, 2009 plaintiff reported to Dr. Jones for a follow-up appointment. Plaintiff said she had quit her job at the animal shelter and felt much better. (Tr. 282.)

---

[16] Lisinopril is used to treat high blood pressure (hypertension) and congestive heart failure. Drugs.com, http://www.drugs.com/lisinopril. Atorvastatin is used to treat high cholesterol, and to lower the risk of stroke, heart attack, or other heart complications in people with coronary heart disease. Drugs.com, http://www.drugs.com/atorvastitn. Furosemide treats fluid retention (edema) in people with congestive heart failure and is also used to treat high blood pressure (hypertension). Drugs.com, http://www.drugs.com/furosemide.

[17] Coreg is used to treat heart failure and hypertension. Drugs.com, http://www.drugs.com/coreg.

On November 17, 2009, plaintiff underwent an echocardiogram. Dr. Hess noted a normal left and right ventricular chamber size and contractility, normal atrial dimension, mild mitral valve leaflet thickening, normal inferior vena cava, and impaired left ventricle relaxation. The echocardiogram also indicated an ejection fraction of 40%. He continued her medication regimen and reiterated the need for a defibrillator. (Tr. 288-89.)

On February 17, 2010, Sharon Falter submitted a Physical Residual Capacity Assessment. She found that plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand, walk, and sit about six hours of an eight-hour workday. Ms. Falter stated that plaintiff could never balance but could frequently climb, stoop, kneel, crouch, and crawl. She found that plaintiff should avoid even moderate exposure to hazards such as machinery and heights due to plaintiff's cardiomyopathy. Ms. Falter said that plaintiff had successfully managed her symptoms and found plaintiff's allegations regarding the severity of the symptoms only partially credible. Ms. Falter stated that despite plaintiff's allegations of fibromyalgia, the record indicated no complaints to physicians and no diagnoses. Additionally, Ms. Falter noted a plaintiff's finding of hypertension but stated that hypertension alone would impose no functional restrictions. (Tr. 331-35.)

On May 13, 2010, plaintiff visited Dr. Hess for a follow up. Dr. Hess noted that plaintiff's most recent ejection fraction was 40%. He stated that plaintiff had not complained of shortness of breath or other symptoms and had been doing reasonably well. Dr. Hess reduced plaintiff's dosage of Coreg. (Tr. 465.)

On December 13, 2010, Dr. Jones wrote a letter regarding plaintiff. The letter noted plaintiff's history of cardiomyopathy with ejection fractions of less than fifty percent and her history of congestive heart failure and renal failure. (Tr. 467.)

**Testimony at the Hearing**

The ALJ conducted a hearing on March 9, 2011. (Tr. 30-52.) Plaintiff testified to the following. She is forty-six years old. She is five feet, one and a half inches and 120

pounds.  She lives in Salem, Missouri.  She is married.  She received social security benefits from 1997 to 2006.  The benefits were discontinued due to an increase in household income.  She has a high school diploma.  (Tr. 31-34.)

She last worked October 9, 2009 at a dog shelter twenty hours per week and four hours per day.  Her duties included caring for cats, sweeping, mopping, laundering, cleaning dishes and pans.  The job caused increased weakness in her arms, legs, and heart and stressed her mentally due to the heavy workload caused by the poor work ethic of her coworkers.  She has had no other employment in the last fifteen years.  (Tr. 36-37.)

She first received a diagnosis of cardiomyopathy in January 1997.  Her heart is slower than normal.  She suffers from high blood pressure related to the cardiomyopathy.  She takes blood pressure medication but still experiences problems with sporadic changes in blood pressure from stress.  Also due to her blood pressure, if she quickly stands or bends, she experiences dizziness and headaches from standing or bending too quickly.  Additionally, she experiences fatigue and mood swings.  The medication causes trips to the bathroom every five to ten minutes for an hour.  Her body swells every day causing numbness and difficulty picking things up.  (Tr. 38-40.)

She experiences pain on her left side, and her legs burn, which keeps her awake at night despite her sleep medication.  She also experiences shortness of breath, which feels like pressure on her chest.  Bending, reaching, and activities like tying her shoes cause her fatigue.  She naps often and is awake for three hours per day.  She goes to bed between 10:00 p.m. and 10:30 p.m..  She gets up at 8:45 a.m.  On a typical night, she stays awake after going to bed because of pain and night sweats.  She sleeps in half-hour periods until 3:00 a.m. when she goes to the bathroom and stretches.  To get comfortable at night, she puts pillows between her legs due to fear of blood clots.  She props her feet on pillows to elevate her legs and keeps moving until she falls asleep.  (Tr. 40-42.)

She takes eight medications for her heart and blood pressure and sees her doctor every three months.  She cannot easily bend, climb stairs, or make her bed.  During the day she can tolerate only two hours of chores before tiring and needing to sit.  She does not drive because she experiences panic attacks, gets lost easily, and getting in out and of

the car causes her pain. When she is in a vehicle for a long period of time, her legs cramp, swell, and occasionally numb. She can tolerate sitting in a chair comfortably for only ten to fifteen minutes. She can stand for only ten to fifteen minutes before she feels like she will fall. (Tr. 43-44.)

She experiences anxiety, and many things stress her out. She does not like being around people and prefers being alone. Hearing other people complain bothers her because she has problems of her own. During her employment at the animal shelter, she left early one day because she was extremely frustrated that her coworkers were not doing their jobs. She nearly hit somebody due to mouthiness, and she had to leave before she was fired. Her husband's family lives near her home, but she does not socialize with them often. She feels like going out is too difficult for her. She receives prescriptions from Dr. Jones for anxiety and depression but does not receive counseling. She participated in regular counseling for two to five years in Pennsylvania for family problems and hatefulness. She has never been hospitalized for her mental problems. (Tr. 44-46.)

Her anxiety and depression medicine causes her to sleep often, nausea, loss of appetite, bowel problems, and constipation. She experiences stress and gets mood swings, and she prefers to be away from any type of noise, including telephones. (Tr. 46-47.)

Vocational Expert (VE) Clarence Hulett also testified at the hearing. The ALJ presented a hypothetical individual with the same education and work experience as plaintiff. She limited the individual to sedentary work and to occupations that require no exposure to dangerous machinery or unprotected heights and simple, routine, repetitive tasks not performed in a fast-paced production environment involving only simple work related decisions, few work place changes, and only occasional interactions with supervisors, coworkers, and the general public.

The VE responded that such individual could work as a sorter, which is sedentary, unskilled work with about 100 jobs locally and 135,000 positions nationally. The VE further stated that the hypothetical individual could also work as an order clerk, which is

sedentary, unskilled work with 100 jobs locally and 185,000 positions nationally. Finally the VE stated that the hypothetical individual could work as an optical goods worker, which is also sedentary, unskilled work with 100 jobs locally and 135,000 positions nationally. (Tr. 47-49.)

The ALJ inquired as to the customary requirements of employers regarding absences, rest breaks, and time on task. The VE responded that employees are expected to stay on task ninety percent of the day, allowed three breaks per day, including lunch, and allow three absences before employment is affected. The ALJ then inquired as to whether exceeding customary limitations would have a consequence on the hypothetical individual. The VE responded that the previously provided jobs would be eliminated and that the hypothetical individual would be ineligible for competitive employment. Plaintiff's counsel then inquired as to whether the aforementioned jobs would be eliminated, assuming the truth of plaintiff's allegations regarding sitting, standing, and fatigue. The VE responded that, assuming the truth of the allegations, plaintiff would be unable to perform any of the employment previously mentioned. The VE also stated that the aforementioned jobs required at least infrequent contact with coworkers, supervisors, and the general public. (Tr. 49-51.)

### III. DECISION OF THE ALJ

On April 15, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 14-23.) At Step One of the prescribed regulatory decision making scheme,[18] the ALJ found that plaintiff had not engaged in substantial gainful activity since December 28, 2009, the application date. At Step Two, the ALJ found that plaintiff's severe impairments were cardiomyopathy, major depressive disorder, and generalized anxiety disorder. (Tr. 14-16.)

---

[18] See below for explanation.

At Step Three, the ALJ found that plaintiff had no impairments or combination of impairments that met or were the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 17.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform sedentary work but limited her to occupations that require no exposure to dangerous machinery or unprotected heights. The ALJ further limited her to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and relatively few work place changes. The ALJ also limited her to only occasional interaction with supervisors, co-workers, and the general public. At Step Four, the ALJ found that plaintiff had no past relevant work (PRW). (Tr. 18-21.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 22.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be

expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination.

### A. Plaintiff's Credibility

Although plaintiff does not expressly dispute the ALJ's credibility finding, prior to determining a claimant's RFC, an ALJ is first required to evaluate the claimant's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). In determining plaintiff's RFC, the ALJ found that plaintiff's statements about her symptoms and conditions were not entirely credible.

The ALJ's credibility findings must be supported by substantial evidence on the record as a whole. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). The ALJ must apply the Polaski factors by giving full consideration to all of the relevant evidence and may not discredit subjective complaints unless they are inconsistent with the evidence in the record as a whole. Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011); Polaski v. Heckler, 739 F.2d 1322, 1322 (8th Cir. 1986). The ALJ outlined the evidence and cited multiple factors to support his credibility finding, including plaintiff's daily activities, treatment history, the lack of significant restrictions on her activities, and the effect of medication on her symptoms.

In his evaluation the ALJ first noted that plaintiff's daily activities and recent employment were inconsistent with the description of her symptoms. (Tr. 20.) "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain." Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009). At the ALJ hearing plaintiff testified that she typically naps throughout the day and that she can only stand for five minutes at a time and sit for ten to fifteen minutes at a time. (Tr. 44.) However, the record contradicts plaintiff's statements, indicating that plaintiff's daily activities include preparing meals for herself and her husband, performing household chores, making beds, caring for her pets, grilling, and shopping. (Tr. 192-96.) Furthermore, plaintiff maintained employment as a janitor at an animal shelter until October 2009. (Tr. 36.) Her job consisted of caring for cats, cleaning pens and food bowls, sweeping, mopping, laundering, and washing dishes. (Id.)

Regarding plaintiff's depression and anxiety, the ALJ noted that she is prescribed medications to treat her symptoms by a family physician and has not attended counseling or been hospitalized due to her mental conditions. (Tr. 19, 21, 45.) A claimant's allegations of disabling pain or other subjective symptoms may be discredited due to

absence of hospitalization, limited treatment of symptoms, and a failure to diligently seek medical care.  Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006);  20 C.F.R. § 416.929(c)(3)(v) (the agency will consider the claimant's treatment when evaluating her symptoms).

Despite plaintiff's claims of disabling symptoms, the record contains no evidence indicating that any treating physicians placed long term restrictions on her.  The ALJ's decision of no disability is supported by the lack of significant restrictions imposed by physicians.  Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999); Brown v. Chater, 87 F.3d 963, 9665 (8th Cir. 1996).  The ALJ's decision mentioned that given plaintiff's testimony, he expected evidence of long-term restrictions. (Tr. 21.)  The record indicates that on June 28, 1998 and January 27,1999, Dr. Hayden, plaintiff's former treating physician, cleared plaintiff for full activity. (Tr. 400-01.)  Moreover, in February 2002, Dr. Hayden advised plaintiff to increase her physical activity. (Tr. 432.)  Additionally, Dr. Jones, plaintiff's current treating physician, submitted a note in anticipation of her hearing with the ALJ that included no information regarding physical restrictions and only briefly discussed plaintiff's medical history. (Tr. 467.)

Furthermore, "impairments that are controllable by medication do not support a finding of total disability."  Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729-30 (8th Cir. 2003); 20 C.F.R. § 416.929(c)(3)(iv)-(v) (the agency will consider claimant's treatment and medication when evaluating her symptoms).  In determining plaintiff's credibility, the ALJ properly found that the record supported that plaintiff's symptoms were well-controlled by treatment. (Tr. 16, 19, 21.)  Throughout the record, plaintiff's physicians noted her condition as stable or improving when she properly took her prescriptions for both cardiomyopathy and depression. (Tr. 383, 385, 388, 391-92, 400, 404, 408-09, 431-32, 438-40.)  In May 2009, plaintiff reported to Dr. Jones that she had not taken her heart prescriptions since the previous July. (Tr. 247.)  Dr. Jones reminded plaintiff of the importance of staying on medication. (Id.)  Following this appointment with Dr. Jones, plaintiff began taking her heart and depression medication regularly.  Her conditions and symptoms stabilized, and her medical tests were "normal." (Tr. 255. 259,

271, 277, 300, 327, 447, 458.)  In regards to her depression, in April 2009 plaintiff told Dr. Spencer that she had taken no psychiatric medication.  (Tr. 243.)  Dr. Spencer stated that, although plaintiff suffered disabling mental impairments, regular treatment and compliance would likely improve her condition.  (Tr. 243-46.)

Accordingly, substantial evidence supports the ALJ's credibility determination.

**B. RFC Determination**

Plaintiff argues that the ALJ's RFC determination is arbitrary and not supported by substantial evidence.  Specifically, she argues that the ALJ's failure to discuss Dr. Spencer's opinion constitutes reversible error and that the ALJ erred by not relying on medical opinion and by failing to fully develop the record.

Plaintiff argues that the ALJ's failure to discuss Dr. Spencer's opinion constitutes reversible error.  "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."  Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010).  "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  Id.  "[A] deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."  Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999).

The ALJ's decision contains no indication that the ALJ considered Dr. Spencer's opinion.  The court recognizes that "an ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled is error when the record contains no contradictory medical opinion."  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  However, Dr. Spencer based his opinion on a single examination of plaintiff as a consulting physician, which entitles his opinion to very little weight.  See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  Courts have found reversible error for failure to consider such opinions in cases where consideration may have impacted the outcome of the case.  See e.g., McCadney v. Astrue, 519 F.3d 764, 767 (8th Cir. 2008); Webster v.

Astrue, 628 F. Supp. 2d 1073, 1092 (D. Neb. 2009). However, here, the ALJ's decision is fully consistent with Dr. Spencer's opinion.

Dr. Spencer examined plaintiff on a single occasion in April 2009. (Tr. 243.) Dr. Spencer noted that plaintiff had not been taking her psychotropic medications. (Id.) Although Dr. Spencer opined that plaintiff's mental illness interfered with her capacity for full time employment, he also predicted an improved mental condition with treatment and compliance with her medical regimen. (Tr. 246.) After she complied with her regimen, her condition improved, which the ALJ recognized as set forth above. Therefore, even assuming that the ALJ did not consider Dr. Spencer's opinion, such failure is harmless error.

Plaintiff further argues that the ALJ erred by not relying on medical evidence and failing to fully develop the record. " [An] ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). A duty to fully develop the record "arises only if a crucial issue is underdeveloped." Ellis v. Barnhart, 392 F.3d 988, 944 (8th Cir. 2005). Here, however, the ALJ was provided with medical records and physicians' notes spanning fifteen years of medical care, disability, function, and work background reports, and hearing testimony.

Plaintiff also argues that the ALJ failed to develop the record due to the lack of medical opinions. Some medical evidence must support the RFC determination. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). However, RFC determinations do not require support from medical opinions. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."); 20 C.F.R. § 404.1545. Therefore, the ALJ did not err by failing to develop the record further.

The ALJ's RFC determination is supported by substantial evidence. Accordingly, plaintiff's argument is without merit.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on March 14, 2014.